# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-23925-CIV-ALTONAGA/O'Sullivan

**FIOR PICHARDO DE VELOZ** and
**CESAR CRISTOBAL VELOZ TIBURCIO**,

      Plaintiffs,

v.

**MIAMI-DADE COUNTY**, *et al.*,

      Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on Defendants, Miami-Dade County, the Public Health Trust, Miami-Dade Corrections and Rehabilitation, Daniel Junior, Officer Audrey Morman, Sergeant Regina Price, Officer Kimberly Jones, Officer Tavarez Carter, Corporal Travarri Johnson, Carlos A. Migoya, Dr. Fredesvindo Rodriguez-Garcia, and Nurse Fatu Kamara Harris's Motion to Dismiss [ECF No. 75] filed February 23, 2017. Plaintiffs, Fior Pichardo de Veloz and Cesar Cristobal Veloz Tiburcio, filed their Response [ECF No. 83] on March 23, 2017; to which Defendants filed a Reply [ECF No. 91] on April 6, 2017. The Court has carefully considered the parties' written submissions, the record, and applicable law.

## I. BACKGROUND

Plaintiffs bring this suit seeking damages under 42 U.S.C. section 1983 and on various state law theories against Defendants for injuries sustained by Fior Pichardo de Veloz[1] during her time in the custody of the Miami-Dade Corrections and Rehabilitation Department ("MDCR").

_____

[1] According to a Miami-Dade Security and Internal Affairs Bureau Memorandum (Mot., Ex. 1, SIAB Memorandum [ECF No. 75-1] 1), Plaintiff's correct name is "Flordaliza Pichardo."

(*See generally* Second Amended Complaint [ECF No. 40]).  On November 4, 2013, Pichardo traveled from the Dominican Republic to Miami for a family visit.  (*See id.* ¶ 3).  At the time, Pichardo was 50 years old and undergoing hormone replacement therapy as prescribed by her doctor to address the symptoms of menopause.  (*See id.* ¶¶ 3 (citation omitted), 21).  Pichardo also suffered from high blood pressure.  (*See id.* ¶ 3 (citation omitted)).

When she arrived at Miami International Airport, Pichardo was arrested on an outstanding warrant and booked into the Turner Guilford Knight Correctional Center ("TGK"). (*See id.* (citations omitted); *see also* Resp. 2).  Upon her arrival at TGK, a non-defendant officer conducted a strip search of Pichardo at 7:17 p.m., "look[ing] at [the inmate's] entire body and mak[ing] sure there [was] nothing inserted up the reproductive area."  (2d. Am. Compl. ¶ 24 (citation omitted; second alteration in original)).  Strip searches are directed by corrections officers although medical staff is often present.  (*See id.* ¶ 32 (citation omitted)).  According to the officer who conducted the search, she "did not notice anything abnormal."  (*Id.* ¶ 24).

Due to Pichardo's history of high blood pressure, Defendant Officer Kimberly Jones escorted her to the medical unit for evaluation later that night.  (*See id.* ¶ 25).  Upon arrival at the medical unit, at approximately midnight on November 5 (*see* SIAB Mem. ¶ 36), Pichardo was placed in a cell with other female inmates (*see* 2d Am. Compl. ¶ 25).  Defendant Officer Audrey Morman was working in the medical unit.  (*See id.*).  Prior to seeing or interacting with Pichardo, Defendant Nurse Harris approached Officer Morman's desk to question her about Pichardo's sex, apparently based on a note in Pichardo's file regarding hormone replacement therapy.  (*See id.*; *see also* Mot., Ex. 3, Statement of Officer Morman[2] [ECF No. 75-3] 6:14–7:5).  Nurse Harris

---

[2] As the Motion and Response note, the Second Amended Complaint incorporates by reference the SIAB Memorandum and several witness statements.  (*See* Mot. 4; Resp. 8–9).  These documents are properly considered on a motion to dismiss.  *See, e.g.*, *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368–69 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and

indicated she believed Pichardo might be male because she was undergoing hormone replacement therapy. (*See* Morman Statement 7:2–20). Officer Morman pointed out Pichardo's file listed Pichardo as female and explained she believed Pichardo to be female, but Nurse Harris stated she would nevertheless "check her out." (*Id.* 7:25–8:8).

Officer Morman accompanied Nurse Harris to retrieve Pichardo from the cell for her examination. (*See id.* 8:23–9:2). Nurse Harris then asked Pichardo if she was female and had "female parts," and a visibly offended Pichardo replied she was. (*Id.* 9:9–16; *see also* 2d Am. Compl. ¶ 26).

Nurse Harris escorted Pichardo into the examination room; Officer Morman did not accompany them. (*See* 2d Am. Compl. ¶ 27). While in the examination room, Pichardo did not remove her clothes. (*See id.*) According to the Second Amended Complaint and SIAB Memorandum, neither Nurse Harris nor the physician on duty, Dr. Fredesvindo Rodriguez-Garcia, physically examined Pichardo. (*See* SIAB Mem. ¶¶ 39, 43; *see also* 2d Am. Compl. ¶¶ 31 (citation omitted), 50 (citation omitted)). Only Dr. Rodriguez-Garcia was present while Pichardo was in the examination room. (*See* 2d Am. Compl. ¶ 32 (citation omitted); *see also* SIAB Mem. ¶ 43).

Following the examination, Nurse Harris told Officer Morman, "everything fell out," by which she meant "penis, testicles." (2d Am. Compl. ¶ 27 (citation, internal quotation marks omitted); Morman Statement 11:2–8). Officer Morman explained she believed Pichardo appeared to be female, but Nurse Harris insisted Pichardo was a male. (*See* 2d Am. Compl. ¶ 27; Morman Statement 11:2–8).

---

those documents are central to the plaintiff's claim, then the [c]ourt may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion . . . will not require conversion of the motion into a motion for summary judgment." (alterations added; citation omitted)).

Officer Morman reviewed Pichardo's file, confirmed she was strip-searched during booking, and observed the file did not note any issues regarding Pichardo's classification as a female during the strip search. (*See* 2d Am. Compl. ¶ 28 (citations omitted)). Officer Morman then called her supervisor, Defendant Sergeant Regina Price, to explain the situation. (*See id.* ¶ 29). Sgt. Price also apparently questioned whether Pichardo was male but nevertheless gave instructions to have Pichardo taken to an all-male cell. (*See id.* (citation omitted)).

Upon her return to the examination unit, Officer Jones — the escorting officer — was informed of the change in the determination of Pichardo's sex. (*See id.* ¶ 30 (citation omitted)). Officer Jones asked Nurse Harris two to three times whether she had strip-searched or physically checked Pichardo to determine whether Pichardo was a male. (*See id.* (citation omitted); Mot., Ex. 2, Statement of Officer Jones [ECF No. 75-2] 7:15–8:14). Nurse Harris did not verbally confirm she physically examined Mrs. Pichardo, but finally replied, "she's a man." (Jones Statement 8:2–3, 8:9–17).

Officer Jones, apparently still doubtful of the correctness of Nurse Harris's statements, contacted her supervisor, Sgt. Price, for guidance. (*See id.* 15:17–16:3). Sgt. Price directed Officer Jones to contact Booking and advise the department of the change in Pichardo's sex determination. (*See id.* 16:5–9). Officer Jones followed Sgt. Price's orders and notified Booking of the change. (*See* 2d Am. Compl. ¶ 35). A Booking officer changed Pichardo's file without first reviewing any supporting documentation. (*See id.*).

Following the change to her file, Pichardo was transferred to Metro West, an all-male facility. (*See id.* ¶ 36). She arrived at Metro West at approximately 12:43 p.m. on November 5. (*See* SIAB Mem. ¶ 36). She was placed with the general population in Three Alpha Wing. (*See* 2d Am. Compl. ¶ 37). A female officer, referred to as Officer Jane Doe No. 1, placed Pichardo

in the cell. (*See id.* ¶ 38). Officer Doe No. 1 apparently acknowledged Pichardo was female, but said only "you are a woman. Good luck if you are alive tomorrow." (*Id.* (internal quotation marks omitted)).

After her placement in Three Alpha Wing, Pichardo was surrounded by approximately 40 men and harassed by the male inmates. (*See id.* ¶ 39). Pichardo later told the investigator she felt "psychologically assaulted because everyone looked at her as if she was a *piñata*." (*Id.* (citation, internal quotation marks omitted)). Pichardo was too afraid to use the all-male bathroom and instead urinated on herself. (*See id.* (citation omitted)). At some point, she asked an unknown female officer to move her out of Three Alpha Wing "because she was going to go crazy." (*Id.* (citation omitted)).

Defendant Officer Tavarez Carter, who was in charge of conducting head counts in Three Alpha Wing, noted Pichardo looked scared to get off her bunk and did not want to interact with other inmates. (*See id.* ¶ 41 (citation omitted)). According to Officer Carter, Pichardo was assigned to Bunk 2, which is closest to the supervising officers. (*See* Resp. 6). Officer Carter told the investigator Pichardo was specifically assigned to Bunk 2 "because whenever there is someone that looks like a female, we always put [th]em to the front so that the officer can watch them." (*Id.* (alteration added; citation omitted)).

On November 5, 2013, Pichardo's family members, in their attempts to contact Pichardo, questioned corrections officers at TGK as to why Pichardo was housed at an all-male facility. (*See* SIAB Mem. ¶ 6). As a result of their prodding, a corporal at TGK contacted the Shift Commander who initiated an investigation into Pichardo's sex. (*See id.*). Pichardo was strip-searched a second time, this time by non-party Nurse De La Espriciella in the North Clinic at Metro West. (*See* 2d Am. Compl. ¶ 42). This second strip search took place between 6:50 p.m.

and 8:23 p.m. on November 5. (*See* SIAB Mem. ¶ 36). Pichardo claims there were several male corrections officers present, laughing at her during the search. (*See* 2d Am. Compl. ¶ 42). Pichardo also recalls photographs were taken of her while she was undressed. (*See id.*). Following this strip search, which confirmed Pichardo's biological sex to be female, Pichardo was separated from the general male population. (*See id.*).

Pichardo was subsequently returned to TGK and housed in an all-female unit. (*See* SIAB Mem. ¶ 6). On November 6, 2013, Pichardo was released from MDCR to the custody of the United States Marshal Service. (*See* 2d Am. Compl. ¶ 47).

Pichardo and her husband, Cesar Cristobal Veloz Tiburcio, filed their initial Complaint [ECF No. 1] on September 13, 2016. Plaintiffs have since twice amended the complaint,[3] and the Second Amended Complaint is the current operative pleading.

The Second Amended Complaint contains 15 claims for relief under both state and federal law, against multiple Defendants. The federal law claims, all brought under 42 U.S.C. section 1983, include: (1) four counts of failure to intervene (Count I – Sgt. Price, Count II – Officer Jane Doe No. 1, Count III – Officer Carter, and Count IV – Corporal Johnson); (2) three counts of deliberate indifference (Count V – Nurse Harris, Count VI – Dr. Rodriguez-Garcia, and Count VII – Officer Jane Doe No. 1); and (3) one count of violation of privacy rights and unreasonable searches against Miami-Dade County (Count VIII). To avoid repetition, the Order addresses the particulars of each of these claims in the Analysis section, section III, below.

The state law claims include: one count of negligence against the corrections officers and Miami-Dade County (Count IX); one count of negligence against the Public Health Trust (Count X); one count of negligent infliction of emotional distress against the corrections officers and

---

[3] The deadline for amending pleadings was March 10, 2017. (*See* Order Setting Trial . . . [ECF No. 58]). As stated, Defendants filed the present Motion on February 23, 2017.

Miami-Dade County (Count XI); one count of negligent infliction of emotional distress against Nurse Harris, Dr. Rodriguez-Garcia, and the Public Health Trust (Count XII); one count of negligent hiring and retention against the Public Health Trust (Count XIII); one count of violating Section 901.211, Florida Statutes, against Miami-Dade County (Count XIV); and one count of loss of consortium brought by Pichardo's husband against all Defendants (Count XV). Because the Court concludes dismissal of the federal claims is appropriate, and it will not retain jurisdiction over the remaining state law claims, this Order does not address the latter claims' sufficiency.

## II. LEGAL STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id.* (alteration added) (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To meet this plausibility standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556).

Courts apply this standard by (1) eliminating allegations which amount to "mere[] legal conclusions," *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (citation omitted); and (2) assuming the veracity of well-pleaded factual allegations and determining whether those "plausibly give rise to an entitlement to relief," *id.* (internal quotation marks and citation omitted; alteration added).

Apart from the factual allegations of the Second Amended Complaint, which are construed in the light most favorable to the plaintiff, *see Brooks*, 116 F.3d at 1369 (citation omitted), the Court also properly considers the SIAB Memorandum and witness statements at the motion to dismiss stage (*see* note 2, *supra*). And where the exhibits "contradict the general and conclusory allegations of the pleading, the exhibits govern." *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) (holding, because the police reports attached to the complaint contradicted plaintiff's allegations about what the officers saw, the court would "not credit [plaintiff's] allegation" (alteration added))). This is because when a plaintiff relies on an attachment to support its allegations, courts may similarly depend on it to establish the facts. *See id.* at 1292 (*citing Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002) ("The fact remains that where a plaintiff attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim.")).

## III. ANALYSIS

The Defendant corrections officers move to dismiss the federal law claims against them on the grounds they did not violate Pichardo's clearly established constitutional rights and so are entitled to qualified immunity. (*See* Mot. 5–12). Defendants further argue the section 1983 claim against Miami-Dade County should be dismissed because Plaintiffs have failed to properly

satisfy the *Monell*[4] standard, as is required to bring a section 1983 claim against a local government entity. (*See id.* 12–16). Nurse Harris and Dr. Rodriguez-Garcia contend because the Second Amended Complaint fails to state a claim of deliberate indifference, and there is no resulting constitutional violation, the medical staff Defendants are also entitled to qualified immunity. (*See id.* 16–19).

While not necessary to resolve the sufficiency of the pleading's federal claims, the Court notes two additional arguments raised by Defendants. Defendants argue Defendants Carlos Migoya and Daniel Junior should be dismissed because the Second Amended Complaint does not contain a single allegation involving them, and Counts II and VII must be dismissed as to the multiple Doe Defendants under Rule 4(m). (*See id.* 2 nn.1–2). The Court addresses these arguments in turn.

### A. Claims Subject to the Qualified Immunity Defense

Defendants assert Sgt. Price, Officer Carter, Cpl. Johnson, Nurse Harris, and Dr. Rodriguez-Garcia are all entitled to qualified immunity. (*See id.* 8–12, 18–19).

"A complaint is subject to dismissal under Rule 12(b)(6) when its allegations, on their face, show that an affirmative defense bars recovery on the claim." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (citing *Marsh v. Butler Cty.*, 268 F.3d 1014, 1022 (11th Cir. 2001) (en banc). Once a qualified immunity defense has been asserted, unless Plaintiffs' "allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. Absent such allegations, it is appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage." *Id.* (alterations, ellipses, internal quotation marks, and citations omitted); *see also Bloom*

---

[4] *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658 (1978).

*v. Alvereze*, 498 F. App'x 867, 872 (11th Cir. 2012) ("[A] defense of qualified immunity may be addressed in a motion to dismiss, which will be granted if the complaint fails to allege the violation of a clearly established constitutional right." (internal quotation marks and citation omitted; alteration added)).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Iqbal*, 556 U.S. at 672 (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (internal quotation marks and citation omitted).

To be entitled to the qualified immunity defense, a government official must demonstrate "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (internal quotation marks and citation omitted). The parties agree the individual Defendants were acting within the scope of their discretionary authority (*see* Mot. 9 n.3 (citation omitted); *see also* 2d Am. Compl. ¶¶ 19, 65, 80, 138, 152); therefore, the burden "shifts to the plaintiff[s] to show that qualified

immunity is not appropriate."[5] *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted; alteration added).

"To survive a motion to dismiss based upon qualified immunity, the plaintiff must have alleged sufficient facts to support a finding of a constitutional violation of a clearly established law." *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1198–99 (11th Cir. 2012) (citation omitted). The plaintiffs "bear the burden of showing that the federal rights allegedly violated were clearly established." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996). This requires Plaintiffs' factual allegations, accepted as true, show both (1) Defendants violated a constitutional right and (2) the constitutional right at issue was "clearly established" at the time of the violation.[6] *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

To satisfy the "clearly established" requirement, a law may not be "defined 'at a high level of generality,'" and the "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted). Although the Supreme Court "do[es] not require a case directly on point, . . . existing precedent must have placed the

---

[5] This two-step approach is enshrined in the Eleventh Circuit's *Zeigler/Rich* analysis which provides:

1. The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."

2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

*Courson*, 939 F.2d at 1487 (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563–64 (11th Cir. 1988) (discussing two-part test)); *see also Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983) (per curiam).

[6] Judges need not address these prongs in any particular order. *See Pearson*, 555 U.S. at 236 (Judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2007) (citations omitted; alterations added).

A defendant is entitled to qualified immunity "unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice . . . what the defendant official was doing would be clearly unlawful given the circumstances." *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (alteration added). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing]' all but the plainly incompetent or those who knowingly violate the law.'" *Young v. Borders*, 850 F.3d 1274, 1282 (11th Cir. 2017) (alteration in original) (quoting *City and Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015)). Furthermore, in this Circuit, only decisions of the United States Supreme Court, Eleventh Circuit, and highest relevant state court can clearly establish the law for qualified immunity purposes. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing *Marsh*, 268 F.3d at 1032 n.10).

### 1. Failure to Intervene Claims (Counts I, III, and IV)

Plaintiffs assert Sgt. Price, Cpl. Johnson, and Officer Carter, all of whom either knew or suspected Pichardo was female, failed to intervene to prevent Pichardo from being placed in an all-male cell. This failure to protect her from unsafe conditions of confinement, according to Plaintiffs, violated Pichardo's constitutional rights. (*See* Resp. 9 ("[E]ach of the correction [sic] officers named failed to intervene in the placement of the Plaintiff in grave danger and were each in a unique position to do so . . . ." (alterations added))).

With respect to Sgt. Price, the failure to intervene claim in Count I alleges she was "acting under color of state law . . . when she instructed her subordinates that Mrs. Pichardo,

although evidently a woman, should be classified as a male." (2d Am. Compl. ¶ 65 (alteration added)). Plaintiffs state Sgt. Price had "a duty to provide safe conditions of confinement" and "to stop other defendant corrections officers from placing Mrs. Pichardo in unnecessarily dangerous conditions of confinement." (*Id.* ¶ 66). Defendant breached that duty by failing to "provide safe conditions . . . and . . . prevent other defendant corrections officers from placing Mrs. Pichardo" in such conditions. (*Id.* ¶ 67 (alterations added)). Plaintiffs further allege Sgt. Price's "direct[ing] Mrs. Pichardo to be confined with male inmates" after "Officer Morman told Sergeant Price that Mrs. Pichardo was female and had already been strip searched by Booking" demonstrates a "reckless disregard for the known rights of Mrs. Pichardo." (*Id.* ¶¶ 68–69 (alteration added)).

As to Officer Carter, Count III alleges he breached his duty "to stop other defendant corrections officers from placing Mrs. Pichardo in unnecessarily dangerous conditions of confinement . . . when he failed to prevent her from being placed in" such conditions, after Pichardo and other inmates told Officer Carter Pichardo was female. (*Id.* ¶¶ 80–82 (alteration added)).

Finally, Count IV alleges Cpl. Johnson violated Pichardo's constitutional rights by failing to intervene "[d]espite suspecting [Pichardo] might be a woman" and "after talking to [Pichardo] and noticing her feminine features." (*Id.* ¶ 87 (alterations added)). Plaintiffs allege Cpl. Johnson "owed Mrs. Pichardo a duty to stop other defendant corrections officers from subjecting Mrs. Pichardo to unnecessarily dangerous conditions of confinement," but "breached that duty when he directed Mrs. Pichardo to get to the front of the line and subjected her to unnecessarily dangerous conditions of confinement." (*Id.* ¶¶ 88–89).

Sgt. Price, Officer Carter, and Cpl. Johnson argue they are entitled to qualified immunity. Each contends he or she: (1) was "neither in the position nor authorized to question, second guess, or reverse the determination made by the medical staff," and (2) "the law at the time of the incident was not clearly established so as to put the officers on notice that their conduct was unconstitutional." (Mot. 5). To this, Plaintiffs insist "[t]here is a well-recognized duty by each of the individually employed constitutional agents . . . named in the Complaint to have protected . . . Mrs. Pichardo, a . . . clearly identifiable female, who had been originally booked as a woman, from being reclassified as a man and placed in the general male population." (Resp. 10 (alterations added)).

Plaintiffs, however, fail to cite any case law establishing even an analogous duty, much less anything to satisfy their very heavy burden of demonstrating the purportedly "well-recognized" duty is "beyond debate," as is required by governing law. *al-Kidd*, 563 U.S. at 741 (citations omitted). Plaintiffs do not provide any decisional law finding an officer liable for failing to prevent a female inmate's placement in an all-male housing unit after medical personnel concluded the inmate was male. Certainly application of broader constitutional principles would not have put the corrections officers on notice they were violating Pichardo's rights. *See White*, 137 S. Ct. at 552 ("'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning' to officers . . . but, 'in the light of pre-existing law the unlawfulness must be apparent.'" (alterations added; citations omitted)).

This is particularly the case given Eleventh Circuit precedent, which instructs that a prison official generally "cannot be held liable for a constitutional tort when his administrative decision was grounded in a decision made by medical personnel." *Acosta v. Watts*, 281 F. App'x 906, 908 (11th Cir. 2008) (citation omitted); *see also Williams v. Limestone Cty.*, 198 F. App'x

893, 897 (11th Cir. 2006) ("[S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care." (alteration added; citations omitted)). While it appears in some instances a Miami-Dade corrections officer may make an inmate's sex determination in the first instance (*see, e.g.*, SIAB Mem. ¶ 34), it is also common practice for medical staff to make that determination alongside the corrections officer, or to be called in to make the determination "when in doubt" (*id.* ¶ 29; *see also* Morman Statement 12:5–13:1, 17:25–18:17). The Court cannot conclude Defendants violated any clearly established constitutional right to intervention in failing to change Pichardo's sex classification after they perceived medical personnel had conclusively stated Pichardo was male — nor have Plaintiffs pointed to any decision of the Supreme Court, Eleventh Circuit, or highest state court that a failure to do so constitutes a violation of clearly established law.

An independent reason also supports the foregoing conclusion. According to the Second Amended Complaint, Pichardo's placement in Metro West resulted in verbal harassment from other inmates, not physical injury. (*See* 2d Am. Compl. ¶ 39). The Court "is doubtful that the Eleventh Circuit recognizes 'failure to intervene' claims outside of the context of the . . . excessive force prohibition." *Whitehurst v. Harris*, No. 6:14-cv-01602-LSC, 2015 WL 71780, at *7 (N.D. Ala. Jan. 6, 2015) (alteration added) (citing *Jones v. Cannon*, 174 F.3d 1271, 1285–86 (11th Cir. 1999)); *see also Tarantino v. Citrus Cty. Gov't*, No. 5:12-cv-434-Oc-32PRL, 2014 WL 4385550, at *9–10 (M.D. Fla. Sept. 2, 2014) (citing cases illustrating same); *see also Sampson v. City of Brunswick*, CV 211-013, 2013 WL 12134188, at *8 (S.D. Ga. Mar. 1, 2013) (noting same).

Admittedly, the Eleventh Circuit does not appear to have expressly foreclosed the possibility of liability in a non-excessive-force failure to intervene case. *See, e.g.*, *Byrd v. Clark*,

783 F.2d 1002, 1007 (11th Cir. 1986) ("If a police officer, whether supervisory or not, fails to or refuses to intervene when a constitutional violation *such as* an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." (emphasis added; citations omitted), *abrogated on other grounds as recognized by Nolin v. Isbell*, 207 F.3d 1253 (11th Cir. 2000)). Yet it is precisely the lack of authority holding an officer liable for failure to intervene in the absence of excessive force that demonstrates Plaintiffs' claimed constitutional violation is not "clearly established." Other courts have reached a similar conclusion. *See, e.g.*, *Jones v. Cannon*, 174 F.3d 1271, 1286 (11th Cir. 1999) (no claim for failure to intervene to prevent a false arrest); *Rance v. Bradshaw*, Case No. 15-cv-81210-KAM, 2016 WL 3199002, at *9 (S.D. Fla. June 9, 2016) (no liability for failure to intervene to stop an illegal search); *Green v. Harris*, No. 6:12-cv-00264-VEH-PWG, 2012 WL 4341812, at *1 (N.D. Ala. Aug. 31, 2012) (no liability for failure to intervene to prevent inmates from yelling racial slurs at another inmate).

As discussed, Plaintiffs' burden to demonstrate the Defendant-officers' duties were "clearly established" is exceedingly high. They have failed to do so. This is simply "not a case where it is obvious that there was a violation of clearly established law under" under existing failure-to-intervene precedent. *White*, 137 S. Ct. at 552 (alteration added). Rather, "this case presents a unique set of facts and circumstances" which "alone should [be] an important indication . . . [Defendants'] conduct did not violate a 'clearly established' right." *Id.* (internal citation omitted; alterations added). Therefore, Sgt. Price, Officer Carter, and Cpl. Johnson are entitled to qualified immunity, barring the claims made in Counts I, III, and IV.

   2.   <u>Deliberate Indifference (Counts V and VI)</u>

Count V alleges Nurse Harris: (1) "[d]espite knowing the risks . . . wrongly re-classified [Pichardo] as male based on no physical or record proof" (2d Am. Compl. ¶ 97 (alterations

added)); (2) "acted with deliberate indifference to the safety of Mrs. Pichardo" (*id.* ¶ 99); and (3) "knew or should have known the consequences of wrongfully re-classifying a female as male. A reasonable nurse in a jail would also comprehend that by [doing so], Mrs. Pichardo would be exposed to sexual harassment, rape, and even murder." (*id.* ¶ 100 (alteration added)).

Count VI alleges Dr. Rodriguez-Garcia: (1) "knew that if Mrs. Pichardo were classified as male, she would be placed in an all-male facility and her safety and life would be at risk" (*id.* ¶ 107); (2) "[d]espite knowing the risks . . . failed to physically examine Mrs. Pichardo and allowed her to be wrongfully re-classified" (*id.* ¶ 108 (alterations added)); (3) "by failing to properly examine and assess Mrs. Pichardo, acted with deliberate indifference to the risks" (*id.* ¶ 110 (alteration added)); and (4) "knew or should have known the consequences of wrongfully classifying a woman as a man in jail. A reasonable doctor in a jail would also comprehend" the dangers (*id.* ¶ 111).

Defendants argue Plaintiffs have not shown Nurse Harris and Dr. Rodriguez-Garcia had the requisite "subjective intent to punish" Pichardo and, therefore, they do not make out deliberate indifference claims under the Eighth Amendment.[7] (Mot. 17–18 (quoting *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011))). According to Plaintiffs, "[t]his standard of purposeful or knowing conduct is not . . . necessary to satisfy the mens rea requirement of deliberate indifference for claims challenging conditions of confinement." (Resp. 14 (alterations added; internal quotation marks omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994))). The Court examines the parties' competing positions.

---

[7] Claims related to conditions of confinement are generally governed by the Eighth Amendment. Although Pichardo was a pretrial detainee at the time of the described events, and therefore protected under the Fourteenth Amendment's Due Process Clause as opposed to the Eighth Amendment's Cruel and Unusual Punishment Clause, the authority is identical. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) ("[T]he applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." (alteration added; citations omitted)).

"To state an Eighth Amendment claim . . . a prisoner must allege facts to satisfy both an objective and subjective inquiry regarding a prison official's conduct." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010) (alteration added) (citing *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004)). To satisfy the objective component, Plaintiffs "must allege a prison condition that is so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." *Id.* The subjective component requires Plaintiffs to "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." *Id.* To successfully state a claim of deliberate indifference, Plaintiffs "must allege that a prison official (1) had subjective knowledge of a substantial risk of serious harm and (2) disregarded that risk "by conduct that is more than mere negligence." *Alvarez v. Sec'y, Fla. Dep't of Corr.*, 646 F. App'x 858, 862 (11th Cir. 2016) (internal quotation marks omitted) (quoting *Richardson*, 598 F.3d at 737). The parties disagree about whether the Second Amended Complaint alleges the medical professionals acted with a sufficiently culpable state of mind.[8]

Plaintiffs appear to be pleading the civil law standard for recklessness in contrast to the criminal law standard, which requires a knowing disregard of risk. *See Farmer*, 511 U.S. at 836–37 ("The civil law generally calls a person reckless who acts or . . . fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. . . . The criminal law, however, generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware." (alterations added; internal citations omitted)).

---

[8] In the Motion, Defendants use case law in the denial of medical care context. (*See generally* Mot.). While Nurse Harris and Dr. Rodriguez-Garcia are medical professionals, Plaintiffs do not allege a failure to address an objectively serious medical need. Instead, they rely on case law discussing deliberate indifference in the context of conditions of confinement. (*See, e.g.*, Resp. 14 (citing *Farmer*, 511 U.S. at 836)).

The Supreme Court in *Farmer*, a case Plaintiffs themselves rely on, expressly rejected the civil law approach:

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, *and he must also draw the inference*. . . . The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."

*Id.* at 837 (alteration and emphasis added). Ultimately, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838.

The facts alleged in the Second Amended Complaint do not satisfy the *Farmer* standard. To the contrary, they specifically foreclose a finding of deliberate indifference because the allegations are that the medical professionals believed Pichardo was male. For example, Plaintiffs state "Nurse Harris concluded that Mrs. Pichardo was male" (2d Am. Compl. ¶ 95); "Nurse Harris concluded that Mrs. Pichardo was a man undergoing gender reassignment" (*id.* ¶ 93); and Dr. Rodriguez-Garcia "concluded that Mrs. Pichardo was a man undergoing gender reassignment" (*id.* ¶ 105). Nothing in the pleading suggests Nurse Harris and Dr. Rodriguez-Garcia realized the inmate, whom they reclassified as a male, was a biological female with a female reproductive system. Stated differently, nothing suggests Defendants "drew the inference" as required by *Farmer*. Accordingly, Plaintiffs do not state claims of deliberate indifference.

This result is consistent with case law in this Circuit. For example, the plaintiff in *Williams v. Department of Corrections* was an incarcerated person who complained multiple

times to corrections officers of threats of serious violence by other inmates. *See* No. 15-14141, 2017 WL 432793, at *1 (11th Cir. Feb. 1, 2017) (per curiam). The plaintiff was placed in protective management and transferred to another facility, but he was eventually transported back to the institution housing the inmates who had threatened him. *See id.* The plaintiff tried to explain to the corrections officers there was likely a mistake in his housing classification because he had previously been transferred. *See id.* The defendant-officers placed one of the aggressors in the plaintiff's dormitory, where he eventually attacked plaintiff in his sleep. *See id.*

The Eleventh Circuit held the plaintiff failed to demonstrate the defendants had acted with deliberate indifference, even though plaintiff alleged defendants "failed to check his Department of Corrections[] file before having him returned to [the facility,] . . . failed to provide a safe classification system at [the] prison[,] [a]nd . . . failed to ensure that the Department of Corrections classification board was in compliance with safety procedures." *Id.* at *4 (alterations added). The court concluded "[a]ccepting those allegations a[s] true, they may demonstrate [the defendants] acted negligently, but they do not show that [they] acted with a 'sufficiently culpable state of mind' because [the plaintiff] never alleged that they knew of yet disregarded a risk of serious harm to him." *Id.* (alterations added) (citing *Chandler*, 379 F.3d at 1289).

"In other words," the defendants "may have placed [the plaintiff] in danger by failing to take certain actions related to his transfer, but they did not <u>know</u> that they were potentially placing him in serious danger." *Id.* (alteration added; emphasis in original). The court affirmed dismissal of the claims, explaining "[b]ecause [the plaintiff] failed to allege facts showing . . . defendants . . . knew of and disregarded a risk of serious harm . . . by conduct that is more than negligence, [the plaintiff's] claims against them fail to state a claim." *Id.* (alterations added; citation omitted).

In this case, as in *Williams*, Plaintiffs fail to allege the subjective knowledge required to state claims of deliberate indifference. Plaintiffs do not plausibly allege Nurse Harris and Dr. Rodriguez-Garcia actually knew they were placing Pichardo in danger. Accordingly, as Plaintiffs do not show Defendants violated a constitutional right, Dr. Rodriguez-Garcia and Nurse Harris are entitled to qualified immunity.

### B. Violation of Privacy Rights & Unreasonable Searches (Count VIII)

In Count VIII, Plaintiffs allege Miami-Dade County "violated Mrs. Pichardo's right to privacy by: (a) [c]onducting an unjustified and unnecessary examination of her genitals; (b) [p]hotographing her genitals; and (c) [f]orcing her to be nude before male corrections officers." (2d Am. Compl. ¶ 130 (alterations added)).

Defendants argue this section 1983 claim against the County fails as a matter of law because Plaintiffs are improperly attempting to hold the County liable on a theory of vicarious liability, rather than because of a County policy or custom, as required under federal law. (*See* Mot. 12). In response, Plaintiffs copy a 2005 newspaper article into their Response, describing a settlement the County reached with a number of people subjected to improper strip searches. (*See* Resp. 15–17 (citation omitted)). Plaintiffs claim this article proves "the County has a long, well publicized, and well litigated, custom and policy of unlawful strip searches." (*Id.* 17). Plaintiffs' position fails to persuade.

"[A] municipality cannot be held liable under [section] 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Consequently, "[l]ocal governing bodies . . . can be sued directly under [section] 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690

(alterations added; footnote call number omitted). In addition, "local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' . . . though such a custom[9] has not received formal approval." *Id.* at 690–91 (alterations and footnote call number added).

To state a *Monell* claim, a plaintiff must allege facts showing: "'(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.'" *Marantes*, 649 F. App'x at 672 (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)). The alleged custom or policy "must be the 'moving force' behind the constitutional deprivation for there to be sufficient causation." *Id.* (quoting *Monell*, 436 U.S. at 690–94). And a plaintiff:

> (1) must show that the local governmental entity . . . has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue.

*Grech v. Clayton Cty.*, 335 F.3d 1326, 1330 (11th Cir. 2003) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (alterations added; additional citations omitted)). Even where a plaintiff intends to prove the existence of an "unofficial custom or practice of the county," it must be "shown through the repeated acts of a final policymaker for the county." *Id.* at 1329 (citing *Monell*, 436 U.S. at 690–91) (additional citation omitted).

---

[9] A custom is "a practice that is so settled and permanent that it takes on the force of law." *Marantes v. Miami-Dade Cty.*, 649 F. App'x 665, 672 (11th Cir. 2016) (internal quotation marks omitted) (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)). This requires a showing of a "longstanding and widespread practice;" a single incident of a violation is insufficient to demonstrate the existence of a policy or custom. *Id.* (internal quotation marks omitted) (quoting *Craig v. Floyd Cty.*, 643 F.3d 1306, 1310 (11th Cir. 2011)).

The Second Amended Complaint does not contain any allegations to support the existence of an unconstitutional County policy or custom related to illegal strip searches. (*See generally* 2d Am. Compl.). Count VIII does not allege Pichardo's experience was the product of a widespread practice of illegal strip searches. It does not identify any policymakers with authority over the entity. The count refers to "Miami-Dade County's acts and omissions" (*id.* ¶ 133), but not the individuals with final policymaking authority for the County — namely, the Board of County Commissioners or the Mayor, *see Williams v. Miami-Dade Cty.*, 859 F. Supp. 2d 1297, 1301 (S.D. Fla. 2012), *aff'd in part, rev'd in part on other grounds* 516 F. App'x 899 (11th Cir. 2013); (*see also* Mot. 15 n.4).

Without the plausible factual allegation that final policymakers' actions caused Pichardo's injuries, Plaintiffs cannot bring a claim against the County. *See Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) ("Only those officials who have final policymaking authority may render the municipality liable under [section] 1983." (alteration added; citation omitted)). The unsupported declaration "Miami-Dade County" is responsible for Pichardo's injuries is insufficient to satisfy a claim under *Monell*.

Rather than addressing Defendants' arguments, Plaintiffs cite a 2005 *Sun Sentinel* article discussing a settlement the County reached with approximately 100,000 individuals improperly strip-searched during the preceding seven years. Plaintiffs argue in their Response the article demonstrates the County has a well-known policy of engaging in illegal strip searches. (*See* Resp. 15–17 (quoting Chrystian Tejedor, *County to Pay $4.5 Million to 100,000 People*, SUN SENTINEL (Apr. 19, 2005), http://articles.sun-sentinel.com/2005-04-19/news/0504190132_1_invasive-searches-strip-search-body-cavity-searches)). The Court does not consider the newspaper article, excerpted in a response memorandum, in considering the

sufficiency of a claim on a Rule 12(b)(6) motion.  *See McKally v. Perez*, 87 F. Supp. 3d 1310, 1317 (S.D. Fla. 2015) ("[A] complaint may not be amended by briefs in opposition to a motion to dismiss." (alteration added; citations omitted)).

The Court also observes other allegations of the Second Amended Complaint — incorporated by reference into Count VIII (*see* 2d Am. Compl. ¶ 128) — contradict Plaintiffs' assertion of the existence of a policy.  For example, the pleading contains several examples of MDCR "policies."[10]  (*See id.* ¶¶ 52–57).  The Complaint states the MDCR has "a 'Zero Tolerance Policy' for incidents of sexual misconduct against inmates by inmates or staff."  (*Id.* ¶ 52).  This includes prohibitions on "taking images of all or part of an inmate's naked body" (*id.* ¶ 54 (bold removed) (quoting MIAMI-DADE CORR. AND REHAB. DEP'T, INMATE SEXUAL ASSAULT/ABUSE PREVENTION, DEPARTMENTAL STANDARD OPERATING PROCEDURE 15-008 (2012) ("DSOP") Section II.E.)), and required training of all MDCR staff with access to inmates regarding the "[s]taff's responsibilities to prevent, detect, report, and respond to sexual violence . . . [and] frisk/strip search procedures for cross gender" (*id.* ¶ 55 (alterations added; bold removed) (quoting DSOP 15-008 Section III.A.1.b & h)).  Plaintiffs even allege "Defendants failed to follow their own policies when an inmate, like Mrs. Pichardo, is in their custody and sexually harassed by other inmates."  (*Id.* ¶ 62).

Regardless of whether the referenced operating procedures meet the definition of "policy" as set forth in *Monell* and its progeny, they signify an official rejection of precisely the kind of illegal strip searches Pichardo was allegedly subjected to.  These specific statements demonstrate Plaintiffs have not satisfied the *Iqbal* pleading standard that would "permit the court

---

[10] Neither Plaintiffs nor Defendants discuss who in the County government is responsible for promulgating these particular "Departmental Standard Operating Procedures."

to draw the reasonable inference that [Miami-Dade County] is liable for the misconduct alleged." 556 U.S. at 678.

As Plaintiffs fail to allege the existence of an official policy or widespread practice of illegal strip searches, Count VIII is dismissed.

### C. Carlos A. Migoya and Daniel Junior

Plaintiffs name as Defendants Daniel Junior, individually and as interim director of the MDCR, and Carlos A. Migoya, individually and in his capacity as chief executive officer of the Public Health Trust. As Defendants point out, not a single allegation involves Junior or Migoya individually (*see* Mot. 2 n.2), and a suit cannot be brought against them in their official capacities, *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. . . . It is not a suit against the official personally." (alterations added; emphasis removed; internal citation omitted)).

Because the real parties in interest are the governmental entities and not the named officials, the Court agrees suit against these Defendants in their official capacities is inappropriate, and Junior and Migoya should therefore be dismissed. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("To keep both the City and the officers sued in their official capacity as defendants in this case would have been redundant and possibly confusing to the jury.").

Defendants have correctly stated the law with respect to official capacity suits, and Plaintiffs do not contest Defendants' argument. As such, Daniel Junior and Carlos A. Migoya are dismissed.

### D. The Doe Defendants

Defendants argue the Doe Defendants should be dismissed because Plaintiffs have yet to identify or serve them. Plaintiffs do not address this argument in their Response.

According to the Federal Rule of Civil Procedure 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made." *Id.* (alterations added). The Rule provides an exception, which allows the court to extend the time for service "if the plaintiff shows good cause." *Id.* "Good cause exists only when some outside factor[,] such as reliance on faulty advice, rather than inadvertence or negligence, prevented service." *Bey ex rel. Washington v. Hillsborough Cty.*, No. 16-10608, 2017 WL 474334, at *2 (11th Cir. Feb. 6, 2017) (alteration in original; citation and internal quotation marks omitted).

Plaintiffs do not address Defendants' argument under Rule 4(m) for dismissing the Doe Defendants, much less show good cause for the failure to timely serve them. Consequently, the Court dismisses those Defendants.

### E. Dismissal without leave to amend

"Ordinarily, if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, leave to amend should be freely given." *Thompson v. City of Miami Beach*, 990 F. Supp. 2d 1335, 1343 (S.D. Fla. 2014) (quoting *Dysart v. BankTrust*, 516 F. App'x 861, 865 (11th Cir. 2013)). District courts may nevertheless "properly deny leave to amend the complaint . . . when such amendment would be futile." *Id.* (alteration added) (citation omitted). Dismissal without leave to amend is also appropriate where an amendment to a complaint is sought to be filed well after a scheduling order deadline. *See McKeever v. Liberty Mut. Group Inc.*, 487 F. App'x 487 (11th Cir. 2012).

Plaintiffs have been aware, following a December 20, 2016 Status Conference [ECF No. 31], the Second Amended Complaint would be their final opportunity to plead their federal claims. At the Status Conference, Defendants placed Plaintiffs on notice regarding at least some of the First Amended Complaint's deficiencies; the Second Amended Complaint does not cure them. Furthermore, the circumstances of this case clearly do not entitle Pichardo to relief under section 1983. Accordingly, the undersigned concludes any further attempts to plead the federal claims would be futile.

With respect to the Doe Defendants, although usually dismissal under Rule 4(m) is without prejudice (*see* FED. R. CIV. P. 4(m)), Plaintiffs have not attempted to argue a "reasonable basis for noncompliance within the time specified," *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2011 WL 830287, at *8 (S.D. Fla. Mar. 8, 2011) (internal quotation marks omitted) (quoting *Gartin v. Par Pharm. Cos., Inc.*, 289 F. App'x 688, 692 (5th Cir. 2008)). Additionally, the Court's most recent Order granting an extension of time to perfect service explicitly stated the "deadline will not be extended." (Order [ECF No. 36]). As such, the claims against the Doe Defendants are dismissed with prejudice.

### F. The State Law Claims (Counts IX–XV)

District courts may, in their discretion, decide whether to exercise supplemental jurisdiction over state law claims, *see Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004) (citing *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999)), and courts in this Circuit are encouraged to dismiss remaining state claims when all federal claims have been dismissed prior to trial, *see id.* at 1089 (citing *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984)). After "tak[ing] into account concerns of comity, judicial economy, convenience, fairness, and the like," *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir.

1999) (alteration added; internal quotation marks and citation omitted), the undersigned concludes exercise of supplemental jurisdiction over the remaining state claims is not appropriate. The better course is dismissal without prejudice to allow Plaintiffs to refile their claims in state court, as they have been unable to properly frame their federal law claims. *See Lagogiannis v. U.S. Bank*, Case No. 14-61809-CIV, 2014 WL 11776950, at *2 (S.D. Fla. Sept. 16, 2014) (citation omitted).

## IV. CONCLUSION

In light of the foregoing, it is **ORDERED AND ADJUDGED** that the Motion **[ECF No. 75]** is **GRANTED in part**. The Second Amended Complaint [ECF No. 40] is **DISMISSED**. The Clerk is instructed to mark this case as CLOSED.

**DONE AND ORDERED** in Chambers at Key West, Florida, this 8th day of June, 2017.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record